IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT VERDERAMO, *et al.*,
    *Plaintiffs*,

v.

    Civil Action No. ELH-13-01764

MAYOR AND CITY COUNCIL OF
BALTIMORE, *et al.*
    *Defendants*.

**MEMORANDUM OPINION**

This case concerns allegations of unlawful salary disparities among civilian employees of the Baltimore City Police Department ("BPD").  In 2007, employees in the Laboratory Section ("Lab") of the BPD received salary increases, but certain categories of Lab employees received greater salary increases than did others.  More than five years later, 40 of the Lab employees who received the smaller salary increases filed suit against the Mayor and City Council of Baltimore ("City") and Baltimore City Police Commissioner Anthony W. Batts, in his official capacity ("Commissioner").  ECF 1; ECF 20 at 6 n.1.  They allege that the disparate pay and "salary inequity" violates Article 24 of the Maryland Declaration of Rights (Count I)[1] and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count II).[2]

---

[1] Plaintiffs' Amended Complaint purports to allege a violation of "Article 64A, § 27(a) of the Maryland Constitution."  ECF 16.  However, plaintiffs later clarified that the reference to "Article 64A, § 27(a)" was a mistake.  *See* ECF 14 at 8 n.2.  Plaintiffs recognize that "Section 1983 [of 42 U.S.C.] is the appropriate enforcement mechanism" for their "federal constitutional claim," ECF 14 at 9, but their suit contains no mention of § 1983.

[2] This Court exercises federal question jurisdiction over plaintiffs' federal claim under 28 U.S.C. § 1331, and exercises supplemental jurisdiction over plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

The City filed a "Motion to Dismiss/Motion for Summary Judgment" ("City Motion," ECF 9), supported by a memorandum of law ("City Memo," ECF 9-1), and exhibits.   The Commissioner filed a "Motion for More Definite Statement," seeking clarification as to whether the plaintiffs sought relief individually or on behalf of a class.   ECF 10.   In response, plaintiffs filed an Amended Complaint (ECF 16), clarifying that they seek relief individually.[3]   Thereafter, the Commissioner filed a Motion to Dismiss ("Police Motion," ECF 19),[4] supported by a memorandum of law ("Police Memo," ECF 19-1).   Although the Police Motion does not include exhibits, the Police Memo refers to the exhibits submitted by the City.   Both motions have been fully briefed.[5]

---

[3] Typically, an amended complaint renders moot a motion to dismiss the original complaint.   However, because the Amended Complaint did not change the substance of the allegations, the City asked me to convert its Motion to Dismiss/Motion for Summary Judgment as to the original Complaint into a Motion to Dismiss/Motion for Summary Judgment concerning the Amended Complaint.   ECF 17.   Plaintiffs consented to this course of action.   *Id.*

[4] The Police Motion was filed by the Commissioner as well as the BPD, and the BPD is referred to as a defendant in the Police Motion.   Plaintiffs did not sue the BPD however.   But, the BPD asserts that an official capacity claim against the Commissioner is, in effect, a suit against the BPD.   Police Memo at 14.   Moreover, the BPD is a State agency.   *See Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 303–04, 780 A.2d 410, 422-23 (2001); Article 16-2(a) of the Code of Public Local Laws of Baltimore City.   Therefore, the BPD claims it "enjoys sovereign immunity against all tort liability," Police Memo at 12, and as to all "State law claims in this case."   *Id*. at 14.

In plaintiffs' opposition, ECF 20 at 6 n.2, they clarify that Commissioner Batts was sued in his official capacity, and observe that the BPD would be liable for any judgments, pursuant to the Local Government Tort Claims Act, §§ 5-301 et seq. of the Courts and Judicial Proceedings Article of the Maryland Code (2013 Repl. Vol.); *see Cherkes*, 140 Md. App. at 323–24, 326, 780 A.2d at 434, 436.

[5] Plaintiffs responded to the Police Motion ("Pl. Opp. 2," ECF 20), supported by numerous exhibits, and the Commissioner replied ("PD Reply," ECF 22).   Plaintiffs also opposed the City Motion ("Pl. Opp. 1," ECF 14), and attached numerous exhibits.   The City filed a reply ("City Reply," ECF 18).

Plaintiffs also filed a Cross-Motion for Summary Judgment ("Cross-Motion," ECF 21), supported by a memorandum ("Pl. Memo," ECF 21-1) and exhibits.  The Cross-Motion appears to request summary judgment only as to plaintiffs' claims against the City, and only the City has filed an opposition ("City Opp.," ECF 23), to which plaintiffs replied ("Pl. Reply," ECF 24).

No hearing is necessary to resolve the pending motions.  *See* Local Rule 105.6.  For the reasons set forth below, I will convert defendants' motions into motions for summary judgment, and I will grant summary judgment to defendants.[6]

## Factual Summary

The plaintiffs in this case are 40 employees of the Laboratory Section of the Baltimore City Police Department whose job titles are either "Criminalist II,"   "Criminalist III," "Criminalist Supervisor," or "Crime Laboratory Quality Officer" (collectively, "Criminalists"). Their salary grades are lower than those of Latent Print Examiners and Firearms Examiners in the Lab.   According to plaintiffs, there are no material differences in the duties and responsibilities in the classes of Lab employees at issue, and thus the disparity in pay is inequitable and irrational, in violation of Article 24 of the Maryland Declaration of Rights and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  For context, I will briefly set forth the responsibilities and requirements of each relevant class of Lab employee.

The responsibilities of a Criminalist II include conducting "complex chemical and physical laboratory tests of unknown substances and evidence involved in crimes."  Criminalist

---

[6] As detailed, *infra*, I notified the parties on February 18, 2014, that I proposed to convert the motions into motions for summary judgment, and I allowed 10 days for objections.  ECF 26. No objections were filed.

II Job Description, ECF 9-3 at 3.  They "are on-call 24 hours a day, seven days a week.  Work is performed in a laboratory where there is exposure to toxic fumes and chemicals, unknown dangerous substances and sharp laboratory instruments."  *Id.*  The position requires a master's degree in chemistry, biology, physics, or a "closely related forensic science," and two years of experience.  *Id.* at 4.  Alternatively, the position is available to applicants with only a bachelor's degree in the above-named fields and three years of experience.  *Id.*  The position also requires certification by the Maryland Department of Health and Mental Hygiene to analyze Controlled Dangerous Substances.  *Id.*  The current pay range is $48,600 to $68,600, annually.  *Id.* at 3.

There are three different Criminalist III positions: DNA Analysis, Trace Analysis, and Drug Analysis.  *See* Criminalist III Job Description, ECF 9-3 at 5–10. The responsibilities of a Criminalist III are similar to those of a Criminalist II, with the added responsibility of "assigning, reviewing and coordinating the work of subordinate [Criminalists I and II]."  *Id.* at 5, 7, 9.  The position of Criminalist III DNA Analyst requires, *inter alia*, a master's degree in "chemistry, biology, physics, or a closely related forensic science including a minimum of 12 semester or credit hours . . . in courses of molecular biology, biochemistry, genetics, or related subjects . . . ."  *Id.* at 6.  The other two Criminalist III positions require either a master's degree and three years of experience or a bachelor's degree and four years of experience, and a Criminalist III Drug Analyst requires state certification.  *Id.* at 8, 10.  The current pay range for each of the Criminalist III positions is $51,000 to $72,000 per year.  *Id.* at 5, 7, 9.

There are two different categories of Criminalist Supervisors: Drug Analyst and Trace Analyst.  A Criminalist Supervisor Drug Analyst "supervises the analyses of unknown substances and evidence involved in crimes.  Work of this class involves supervising the

activities of criminalist personnel," as well as evaluating their performance and making personnel recommendations.   Criminalist Supervisor Job Description, ECF 9-3 at 11.   The position of Criminalist Supervisor Drug Analyst requires a master's degree and five years of experience or a bachelor's degree and six years of experience, as well as a certification from the State.   *Id.*   The position of Criminalist Supervisor Trace Analyst is similar in terms of responsibilities and educational requirements, but is directed toward "the analyses of minute quantities of unknown substances, blood and trace evidence involved in crimes."   *Id.* at 13.   The current pay range for the Criminalist Supervisor positions is $58,800 to $83,800 per year.   *Id.* at 11, 13.[7]

Two other types of Lab employees are pertinent here: Latent Print Examiners and Firearms Examiners.   A Latent Print Examiner "identifies, classifies, develops and analyzes latent fingerprint evidence of suspect persons."   Latent Print Examiner Job Description, ECF 9-3 at 19.   Latent Print Examiners "work a conventional workweek," but their work "is performed in a laboratory setting where dangers from noxious fumes exist."   *Id.*   The position requires a bachelor's degree in criminalistics, chemistry, biology, physics, or a related science; two years of experience; and certification as a Latent Print Examiner by the Latent Print Certification Board of the International Association for Identification.   *Id.* at 20.   The current pay range is $64,800 to $91,100. *Id.*

A Firearms Examiner "identifies and examines bullets, bullet fragments, cartridges and firearms used in crimes."   Firearms Examiner Job Description, ECF 9-3 at 15.   Firearms Examiners are on-call 24 hours a day, seven days a week, and their work is performed amid

_____

[7] A job description for the Crime Laboratory Quality Officer does not appear in the record.

"loud gunshots" and "dangerous weapons." *Id.* The position requires a bachelor's degree in criminalistics, chemistry, biology, physics, or a related science and two years of experience. *Id.* No certifications are required. The annual pay currently ranges from $64,800 to $91,100. *Id.*

In February 2005, each of the above-described positions offered a salary less than the current salary. Perceiving this as a problem, Edgar F. Koch, the Director of the Lab, sent a memorandum to the Chief of the BPD Detective Division. *See* Feb. 2005 Memo, ECF 20-1.[8] In the Memo, he expressed concern about Lab employees leaving BPD for higher-paying positions in other jurisdictions. *Id*. In November 2005, Mr. Koch sent a similar memorandum to Edward C. Schmitt, Director of BPD's Personnel Section. *See* Nov. 2005 Memo, ECF 20-2. Mr. Koch advised, *id.:*

> The Crime Laboratory has been experiencing a situation that involves loss of personnel and the hiring of suitable replacements. . . . Over the past two years, the Laboratory has lost several key personnel in the Drug Analysis Unit, Firearms, Latent Prints and Mobile Units. This loss can be attributed to two factors; (1) low salary and (2) the inordinate amount of workload.

The November 2005 Memo outlined the qualifications, training periods, caseloads, and salaries for each of several Lab positions. And, it explained that the salaries paid by BPD were substantially lower than those paid to similar employees in surrounding jurisdictions. *Id.* The memo concluded, *id.:* "It is recommended that the Laboratory personnel be upgraded in salary to eliminate further loss of experienced personnel."

At the request of the BPD, the Baltimore City Department of Human Resources ("DHR") conducted a Crime Laboratory Salary Study ("Study") to review the compensation of

---

[8] The recipients of several of the memoranda are identified only by their job titles.

classifications of civilian Lab employees.  ECF 9-5.  The Study, submitted by DHR on April 6, 2006, recommended the following "class upgrades" to the BPD, *id.*:

- Criminalist II - Grade 112 to Grade 114
- Criminalist III - Grade 113 to Grade 115
- Criminalist Supervisor - Grade 116 to Grade 118
- Crime Lab Quality Control Officer - Grade 115 to Grade 116
- Latent Print Examiner - Grade 094 to Grade 114
- Firearms Examiner - Grade 094 to Grade 114

On April 25, 2006, a few weeks after DHR released its Study, Mr. Koch wrote to the Chief of the Criminal Investigation Division. *See* Apr. 2006 Memo, ECF 21-5.  He suggested that the Study did not fully capture the degree to which Lab salaries lagged behind those in neighboring jurisdictions.  He requested that the position of Criminalist II be upgraded to Grade 118; that Criminalist III be upgraded to Grade 119; and that Criminalist Supervisor be upgraded to Grade 121.  *Id.*  Mr. Koch did not make a specific recommendation regarding the pay grades of the Latent Print and Firearms Examiners, but he did highlight the lengthy training period, substantial backlog, and comparatively low salaries of those positions.  *Id.*  The record does not contain any response from the Chief of the Criminal Investigation Division.

On August 11, 2006, Mr. Koch sent the Police Commissioner[9] an "Appeal of Salary Study Conducted by [DHR]."  Appeal, ECF 20-4.  In the Appeal, Mr. Koch contended that the BPD "salary study has many errors in it," and he provided extensive data on the salaries and workloads of surrounding jurisdictions.  *Id.*  Mr. Koch also identified several Lab employees who had left the Lab for higher-paying positions elsewhere, and he noted that the "National [I]nstitute of Justice [estimated] the advertising, hiring and training of an individual at approximately $250,000 per person."  *Id*.  The Appeal also included a list of the backlogs in each

_____

[9] Leonard D. Hamm was the Baltimore City Police Commissioner on August 11, 2006.

department; the backlog for Latent Print Examiners was easily the largest of all the units listed. *Id*. In addition, Mr. Koch expressed particular concern about the Lab's difficulty in attracting qualified Latent Print and Firearms Examiners, and he advocated for "[t]he movement of the Firearms and Latent print examiners from the CUB [City Union of Baltimore] bargaining unit to MAPS [Managerial and Professional Society of Baltimore, Inc.]," which would result in an increase in their salaries. *Id.* Mr. Koch also requested that several other classes of Lab employees be upgraded to a level higher than that recommended by DHR. As relevant here, he recommended that Criminalist II be upgraded to Grade 118; Criminalist III to Grade 119; Crime Lab Supervisor to Grade 121 or 122; and Lab Quality Officer to 120. *Id.*

Mr. Koch wrote to the Chief of BPD's Administrative Division on January 24, 2007, to express the urgency of the need to increase the salaries of Firearms Examiners. *See* Jan. 2007 Memo, ECF 20-5. He requested "that the firearms examiner position be upgraded from a Grade 94 to Grade 119." *Id*. In his memo, Mr. Koch explained, *id.:*

> Several months ago, a request was submitted to Human Resources to upgrade the Laboratory personnel. This request was to upgrade the entire Laboratory Section; but recently events have occurred that has developed this request into a critical situation. The Firearms Unit has not been able to attract qualified personnel to take the position of firearms examiner. This has resulted in a 1,000+ case backlog. Cases are now being dismissed in court due to the lack of firearms examination.

On or around April 2, 2007, Deborah F. Moore-Carter, Baltimore City's Labor Commissioner, moved the Latent Print Examiners and Firearms Examiners from CUB to MAPS. *See* Union Letter, ECF 20-6. According to a letter Ms. Moore-Carter sent to the President of CUB, the move was made because "it was determined that they have more of a 'community of

interest' with MAPS." *Id.* As a result of the move, Firearms Examiners and Latent Print Examiners were upgraded from Grade 94 to Grade 114, with a corresponding salary increase. *Id.*

Mr. Koch wrote another memorandum to the Chief of the Administrative Division on June 21, 2007, *see* June 2007 Memo, ECF 20-7, advising that when the Firearms Examiners were moved from CUB to MAPS, they were placed in the first level of the MAPS hiring scale. *Id.* However, he noted that the Firearms Examiners on staff "have 10 to 20 years [of] experience and should have been placed in the 'Experienced Level'" at Grade 120. *Id.* At some point thereafter, the Firearms Examiners on staff were upgraded to Grade 120, although it is not clear from the record how or when this occurred.

In October 2007, Gladys B. Gaskins, then the Director of DHR, sent a formal request to the City's Board of Estimates ("BOE"),[10] asking to upgrade several classes of Lab employees. *See* Gaskins Request, ECF 9-6. BOE approved the request shortly thereafter. *Id.* As a result, all of the classes to which plaintiffs belong were upgraded in accordance with the recommendations made in the DHR Study. However, the Latent Print Examiners were upgraded more than had been advised in the DHR Study. In particular, the upgrades that went into effect pursuant to Gaskins's request were, *id.:*

- Criminalist II - Grade 112 to Grade 114
- Criminalist III - Grade 113 to Grade 115
- Criminalist Supervisor - Grade 116 to Grade 118

---

[10] The BOE is composed of the Mayor, the City Comptroller, the President of the City Council, the City Solicitor, and the Director of Public Works. Pursuant to the Baltimore City Charter, the Board of Estimates formulates and executes the fiscal policy of the City. Its responsibilities as to salaries are set forth in Article VI, §§ 10 and 12 of the City Charter. The BOE considers various requests for appropriations submitted by City agencies, and submits a proposed budget ordinance to the City Council. The Council may reduce or eliminate expenditures and approve or disapprove the Ordinance. The Board of Estimates is also responsible for awarding contracts and supervising all purchasing by the City.

- Crime Lab Quality Control Officer - Grade 115 to Grade 116
- Latent Print Examiner - Grade 94 to Grade 120[11]

In sum, as of October 2007, Latent Print and Firearms Examiners were classified at Grade 120, while the varying classes of Criminalists were classified between Grades 114 and 118.   Plaintiffs allege that they "all complained through the appropriate chain of command about these pay inequities requesting that they be rated at the same grade or higher than the Latent Print and Firearm Examiners."  Am. Compl. ¶ 19.  In response to "those complaints and others," *id*. ¶ 20, the City commissioned Fox Lawson and Associates ("Fox Lawson") to perform a Human Resources Compensation Study.   Among other things, Fox Lawson was to make recommendations for a new salary structure for City employees within MAPS.  *Id.* ¶ 20; Fox Lawson Report, ECF 1-5.  The resulting report (the "Fox Lawson Report"), which was provided to the City on February 1, 2008, concluded that the positions of Criminalist II, Crime Lab Quality Control Officer, Latent Print Examiner, and Firearms Examiner should all have equivalent pay grades.  *See* Fox Lawson Report at 9–10.  Moreover, the Fox Lawson Report concluded that the Criminalist III position should be paid at a higher level than Latent Print Examiners and Firearms Examiners.  *Id.*

However, according to plaintiffs, the BPD and the City did not make any pay adjustments to bring their salaries in line with those of the Latent Print Examiners and the Firearms Examiners.  *Id.* ¶ 21.  By letter dated March 28, 2012, counsel for plaintiffs filed a "Salary Parity Grievance" on behalf of plaintiffs.  *Id.* ¶ 22; *see* ECF 1-8.  The grievance alleged that the "salary inequity violated the Maryland Constitution as well as the Equal Protection Clause of the United

---

[11]  In light of the April 2007 Memo, which states that Latent Print Examiners were upgraded to Grade 114, it appears that the Gaskins Request erroneously stated that Latent Print Examiners had been at Grade 94.

States Constitution."  Am. Compl. ¶ 22.   In response to the Salary Parity grievance, "the Personnel Director for the Police Department arranged a meeting with Deputy Commissioner Skinner, Legal Advisor Jim Green and Personnel [R]epresentative Natasha Mahasa and representative Laboratory members and their counsel." *Id.* ¶ 24; *see* ECF 1-8.  Ms. Mahasa then referred the matter to Ms. Moore-Carter, ECF 1-8, and she (Moore-Carter) wrote to DHR on June 11, 2012, "requesting a study of the classes of Criminalist I, II, and III.  ECF 1-9.  However, it does not appear from the record that any study has been conducted, nor has any salary increase been instituted.

This suit followed in June 2013.[12]  Plaintiffs assert, *inter alia*, that the BPD "continues to have problems retaining and recruiting persons in the position of Criminalists II and III due to the ongoing pay inequity," Am. Compl. ¶ 26.  Further, they allege that the citizens of Baltimore "may be endangered by an exodus of laboratory experts whose opinions and testimony are crucial and critical to the prosecution of criminal defendants." *Id.* at 3.

Additional facts are included in the Discussion.

## Standard of Review

As noted, the City's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "or in the alternative" for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d

---

[12] Defendants argue that plaintiffs' suit is barred by limitations.  In response, plaintiffs maintain that the salary disparities constitute a continuing violation of law, and that they are entitled to recover for "the inequitable pay practices that were committed from June 18, 2010 through June 18, 2013," when suit was filed.  ECF 14 at 10.  My disposition of the matter makes it unnecessary for me to resolve this issue.

431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

When, as here, the movants expressly caption their motion "in the alternative" as one for summary judgment, and submit matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).  In this case, the City captioned its Motion alternatively as a motion to dismiss or for summary judgment.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C Wright & Miller, *Federal Practice & Procedure* § 2720, at 159 (3d ed. 2004, 2012 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165–67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49.  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).  If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Id.* at 244 (citations omitted).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d)

request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244–45 (internal citations omitted). Thus, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

In this case, plaintiffs have not filed a Rule 56(d) affidavit objecting to conversion of the City Motion into one for summary judgment. Indeed, they responded to the matter with a cross-motion for summary judgment, confirming that they are amenable to disposition on summary judgment prior to discovery. And, they have submitted extrinsic matter of their own. Specifically, they have filed numerous exhibits including police department memoranda and affidavits. Accordingly, I will exercise my discretion to consider the City Motion under a summary judgment standard.

The Police Motion is not styled in the alternative as one for summary judgment. However, the accompanying memorandum relies on several materials outside the pleadings, including those attached as exhibits to the City Motion and the plaintiffs' opposition. And, plaintiffs' opposition to the Police Motion also includes several exhibits.

However, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010). Accordingly, on February 18, 2014, I sent a Memorandum to counsel, proposing to consider the extraneous material in connection with the Police Motion, and asking counsel to advise me of any objections within 10 days. ECF 26. No party filed an objection. Accordingly, I will treat the Police Motion as a motion for summary judgment.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The district court's "function" in resolving a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248. In contrast, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the

parties deserves judgment as a matter of law.'" *Rossignol v. Voorlwar.* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

## Discussion

Relying on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights, plaintiffs assert that the "practice of paying Plaintiffs significantly lower salaries than those paid to the Latent Print and Firearms Examiners, violates" federal and Maryland constitutional law. Am. Compl. ¶ 43. They maintain that the classification of their positions at below Grade 120, while the Latent Print and Firearms Examiners are classified at Grade 120, is without any rational basis. Therefore, they insist that the salary disparity is unconstitutional.

Defendants raise numerous objections to plaintiffs' claims. Procedurally, defendants argue that plaintiffs' claims are barred by the statute of limitations; that, as to the state constitutional claim, plaintiffs failed to provide the notice required by the Local Government Tort Claims Act, Md. Code (2013 Repl. Vol.), §§ 5-301 et seq. of the Courts and Judicial Proceedings Article ("C.J."); that the City is not a proper defendant; and that sovereign immunity bars plaintiffs' claims against Commissioner Batts and the BPD. As a substantive matter, defendants challenge the merits of plaintiffs' federal and state constitutional claims.

For the reasons that follow, I conclude that plaintiffs' claims fail on the merits. Accordingly, I do not resolve the many procedural issues addressed by the parties.

As an initial matter, "Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett,* 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted). Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v. Comptroller of Treasury,* 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 704, 426 A.2d 929, 941 (1981)). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Hawkins*, 955 F. Supp. 2d 474.

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Although "[t]he Equal Protection Clause was intended as a restriction on state *legislative* action," *Plyler*, 457 U.S. at 216 (emphasis added), governments "do not escape the strictures of the Equal Protection Clause in their role as employers." *Engquist v Oregon Dept. of Agr.*, 553 U.S. 591, 597 (2008). Accordingly, "the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id*. at 605.

However, the Equal Protection Clause does not itself provide a private cause of action. Rather, 42 U.S.C. § 1983 is the mechanism that "provides a cause of action for all citizens injured by an abridgment" of the Equal Protection Clause.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119–20 (1992).   In particular, § 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. A local government may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."  *Monell v. New York City Dept. of Soc. Services,* 436 U.S. 658, 694 (1977).

If a statute classifies on the basis of a so-called "suspect" class—such as race, religion, or national origin—the statute is reviewed by way of "strict scrutiny," under which the statute will only be upheld if it is "narrowly tailored" to achieve a "compelling" government interest.  *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (finding that the University of Michigan Law School's use of race as one of many factors in admissions process satisfied strict scrutiny). When a statute classifies on the basis of a "quasi-suspect" class, such as gender, the classification will fail "unless it is substantially related to a sufficiently important governmental interest." *Cleburne*, 473 U.S. at 441; *see United States v. Virginia*, 518 U.S. 515, 524 (1996) (striking down as unconstitutional the Virginia Military Institute's exclusion of women from its citizen-soldier program); *cf. Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (discussing the corresponding levels of scrutiny in the free speech context).

In contrast, a statutory classification that does not proceed along suspect lines need only satisfy the less-stringent "rational-basis review," which requires only that the classification be "rationally related" to a "legitimate governmental interest." *Armour v. City of Indianapolis, Ind.*, ___ U.S. ___, 132 S. Ct. 2073, 2080 (2012); *see Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013).  Under rational-basis review, a governmental classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Comm.*, 508 U.S. at 313; *accord Armour*, 132 S. Ct. at 2080 (2012); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  In other words, the government need not prove what the decisionmakers' *actual* motivations were; it need only identify a reasonable basis on which the decisionmakers rationally *could have* relied.

Here, plaintiffs do not allege that defendants used any suspect classification or infringed on any fundamental right when determining the relative salaries of Lab employees.  Thus, as plaintiffs acknowledge, Opp. 1 at 30, the salary structure need only satisfy rational-basis review in order to be upheld.

The Supreme Court has described rational-basis review as "a paradigm of judicial restraint." *F.C.C. v. Beach Comm., Inc.*, 508 U.S. 307, 314 (1993); *see also Adkins v. Rumsfeld*, 464 F.3d 456, 469 (4th Cir. 2006) ("[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.").  It "embodies an idea critical to the continuing vitality of our democracy: that courts are not empowered to 'sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations.'" *Wilkins*, 734 F.3d at 348 (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

- 20 -

The Fourth Circuit has articulated a two-step test when evaluating equal protection claims under rational-basis review.  First, the court must determine "whether the purpose that animates [the challenged] laws and regulations is legitimate."  *Adkins*, 464 F.3d at 469 (internal quotation marks omitted); *see Finnin v. Bd. of Cnty. Comm'rs of Frederick Cnty., Md.*, 498 F. Supp. 2d 772, 780 (D. Md. 2007).  Second, the court examines "whether it was 'reasonable for the lawmakers to believe that the use of the challenged classification would promote that purpose.'"  *Adkins*, 464 F.3d at 469 (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668 (1981)).

Plaintiffs do not dispute—nor could they—that defendants satisfy the first step of this test.  The purposes animating the salary structure of Lab employees are solving crimes, improving the efficacy and efficiency of the Lab, and ensuring an adequate pool of qualified workers.  These undoubtedly are legitimate governmental goals.  Thus, the only question is whether defendants[13] rationally could have believed that granting a larger salary increase to Latent Print Examiners and Firearms Examiners than to Criminalists would further those goals.

In *Giarratano v. Johnson*, *supra*, 521 F.3d at 303, the Fourth Circuit described the heavy burden a plaintiff bears when claiming that a governmental classification has no rational relation to its legitimate goals, *id.* (internal citations and quotation marks omitted):

> Under this deferential standard, the plaintiff bears the burden to negate every conceivable basis which might support the legislation.  Further, the State has no obligation to produce evidence to support the rationality of the statute, which may be based on rational speculation unsupported by any evidence or empirical data. Rather, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.  If the

---

[13] As detailed, *supra*, the decision-making process that led to the increase in salaries of Lab employees involved several City and police individuals and entities.  For convenience, I will sometimes refer to the decision-makers as the "City."

classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. Indeed, a legislative choice is not subject to courtroom fact-finding, and equal protection analysis is not a license for the courts to judge the wisdom, fairness, or logic of the legislative choices.

Defendants proffer and/or provide evidence of several rational bases for the challenged classification. First, they point out that in 2006–2007, Baltimore "ranked fifth nationally among major metropolitan areas in the overall rate of gun-related deaths per capita." City Memo at 1.[14] And, they observe that Latent Print and Firearms Examiners "play a pivotal role in solving and ultimately reducing gun crimes." *Id*. Therefore, it would have been rational for the City to conclude that attracting and retaining Latent Print and Firearms Examiners was a high priority that justified a salary increase for those positions.

Second, according to the Appeal sent from Mr. Koch to the Police Commissioner, ECF 21-6, the training periods for Latent Print Examiners (24 months) and Firearms Examiners (36 months) are generally longer than those for Criminalists (12–24 months). And, considering the substantial cost of hiring and training Lab employees, *see id.*, it would have been entirely rational for the City to believe that it should prioritize the retention of the Lab employees whom BPD had spent the most time (and thus money) training. Put differently, the City may have calculated that it would be more costly to lose a fully trained Latent Print Examiner or Firearms Examiner than it would be to lose a fully trained Criminalist, and therefore it made sense to pay more to the Latent Print and Firearms Examiners.

---

[14] For this statistic, the City Memo cites a report attached as Exhibit A to its Memo, issued by the Centers for Disease Control and Prevention ("CDC"). It is entitled "*Violence-Related Firearm Deaths Among Residents of Metropolitan Areas and Cities—United States, 2006–2007.*"

Third, the PD employed fewer Latent Print and Firearms Examiners than it did Criminalists. Appeal at 2–4. As a result, the loss of a single Firearms Examiner or Latent Print Examiner resulted in a proportionately larger depletion of the total workforce in those categories than did the loss of a single Criminalist. *See* Police Memo at 21. Once again, this provides a rational basis for paying Latent Print and Firearms Examiners more than Criminalists.

Fourth, the 2006 review of salaries for similar employees in surrounding jurisdictions revealed that most were paying their firearms and fingerprint examiners more than their drug or trace analysts. *See* Appeal, ECF 20-4. For example, the Baltimore County Police Department paid members of its firearms unit and latent print unit from $41,540 to $65,247, while paying its drug and trace analysts from $37,756 to $59,219. Similarly, the Prince George's County Police Department paid its firearms examiners from $48,655 to $94,497, while paying its drug, DNA, and trace analysts from $36,327 to $91,302. To be sure, the comparisons are imperfect, as other jurisdictions structure their departments differently than does BPD. But, it is clear that a rational decisionmaker seeking to create a competitive salary structure could view this data and conclude that the market rates for firearms and latent print examiners are higher than those for drug, trace, and DNA analysts.

Fifth, according to the Appeal, BPD had more trouble recruiting Latent Print and Firearms Examiners than it did other Lab employees. *See id.*; City Memo at 23 ("[L]atent print and firearms examiner positions were overwhelmingly the most difficult to fill."). The Appeal further advised, ECF 21-6 at 6:

> Over the past four years, vacancies in the Latent Print Unit were advertised nationally for trained latent print examiners. This was unsuccessful and those positions were filled with crime lab technicians. Since November 2005, the Firearms Unit has advertised nationally for three vacant positions. The first

advertisement resulted in no applicants.   A second advertisement was posted. Four applicants applied, but are not fully trained.

Moreover, the January 2007 Memo from Mr. Koch to the Chief of the Administrative Division revealed that the situation was particularly dire with respect to the Firearms Examiners. ECF 14-5.  The Memo explained that the Firearms Unit faced a "1,000+ case backlog" and that cases were "being dismissed in court due to the lack of firearms examination."  In my view, the particular difficulty that BPD faced in attracting qualified Latent Print and Firearms Examiners gave the City a rational basis to increase their salaries and thereby help recruiting efforts.

Sixth, the Appeal lists the size of the "backlog" of cases for several types of Lab employees.  The backlog for Latent Print Examiners (4,512) was by far the largest of the list, which included Drugs (1,541), Trace (856), DNA (618), and Firearms (606).  Looking at this data, the City rationally could have concluded that it was particularly important to attract and retain Latent Print Examiners.[15]

In sum, the City may have decided to pay Latent Print and Firearms Examiners more than Criminalists for any number of rational reasons, including that (1) the City believed their work was particularly important to solving gun crimes, with which the City was (and is) plagued; (2) BPD spent more time and thus more money training them, and as a result the loss of such

---

[15] To be sure, the City's efforts might have been misguided, and may have resulted in unforeseen, adverse consequences.  For example, a recent front page article in the Baltimore Sun reveals that the DNA unit of the BPD now suffers from a severe backlog of cases that has hampered BPD's ability to solve serious crimes.  In one particular instance, the backlog delayed the identification and arrest of a suspect in a 2012 rape until early 2014, by which time the suspect allegedly had committed a similar offense against a different victim.  *See* Justin Fenton, *Lab Backlog Delayed Arrest*, Baltimore Sun, February 21, 2014, at A1, *available at* http://www.baltimoresun.com/news/maryland/crime/blog/bs-md-ci-rape-arrest-dna-backlog-20140219,0,6244055.story.

But, the merits of the City's strategy are not the point.  The City was entitled to attempt to address the concerns that it identified, so long as it had a rational basis for doing what it did.

employees was especially costly; (3) there were less Latent Print and Firearms Examiners on staff than there were Criminalists, meaning that the loss of a Latent Print Examiner or Firearms Examiner had a relatively larger impact on the Lab; (4) BPD was having particular trouble recruiting Latent Print and Firearms Examiners; (5) at the time, the backlog as to fingerprint analyses was larger than any other backlog; and (6) the market rate of pay for Firearms Examiners and Latent Print Examiners was higher than for drug, DNA, and trace analysts. All of these bases are rationally related to legitimate governmental interests in preventing and solving crime. Thus, the classification satisfies rational-basis review.

Notably, it does not matter whether the City *actually* relied on these bases in deciding to pay more to the Latent Print and Firearms Examiners than to other Lab employees. All that matters for the purposes of rational-basis review is that the City "reasonably *could have believed* that paying those employees more was rationally related to a legitimate government interest." *Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 290 (4th Cir. 1998) (emphasis added). And, plaintiffs bear the burden of negating "every conceivable basis which might support" the pay disparity. *Giarratano*, 521 F.3d at 303. So, to survive summary judgment, plaintiffs must show that the City could not reasonably have believed *any* of these rationales. As discussed below, plaintiffs cannot meet this heavy burden.

To be sure, plaintiffs have identified several reasons why paying Criminalists at a rate equal to or greater than Latent Print and Firearms Examiners would be sensible. For example, they note that the position of Criminalist II requires a master's degree, while Latent Print and Firearms Examiners need only bachelor's degrees. Further, they claim that although all Lab employees conduct lab tests, the tests conducted by Criminalists are more complex and involve

dangerous and unknown substances.   And, they point to the Fox Lawson Report, which recommended payment of Criminalists at a level greater than or equal to Latent Print Examiners and Firearms Examiners.   These contentions may be true or sound, but they are beside the point. The Equal Protection Clause does not require the City to pay Lab employees on the basis of their educational achievements, the complexity of their work, or the recommendations of a consulting firm.

With regard to the objective of solving gun crimes, plaintiffs contend that Criminalists play an equally important role in solving violent crimes, and plaintiffs describe two instances in which violent crimes were solved without the help of Latent Print and Firearms Examiners.  *See* Pl. Reply at 4.   The matter of who deserves the most credit for solving violent crimes misses the mark.   That Criminalists play a crucial role in solving violent crimes does not preclude the City from rationally believing that Latent Print and Firearms Examiners also play a crucial role in solving those crimes, and that their recruitment and retention issues compel higher salaries for them.  *See Armour*, 132 S. Ct. at 2080 ("[A classification must be upheld if] there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.").

As to defendants' contention that the salary disparity is justified by the Lab's desire to halt the "exodus" of Latent Print and Firearms Examiners to other jurisdictions, plaintiffs argue that the Lab has suffered from "an exodus of *all* categories of Crime Lab workers from the BPD to more prosperous locales."  Pl. Opp. 2 at 42 (emphasis added).  Thus, according to plaintiffs, it

was irrational for the City to give a larger pay raise to the Latent Print and Firearms Examiners. However, even if all types of Lab employee were leaving at equal rates, it would not be irrational for the City to be more concerned about the "exodus" of Latent Print and Firearms Examiners. The City may have been of the view that these Lab employees played a more important role in solving gun crimes; it took more time and thus more money to train them; and the BPD employed fewer of them.  Any of these bases would be rational, and thus any of them would justify the City's action.

Plaintiffs also assert: "It is not enough for Defendants to speculate that the higher number of Criminalists creates a situation in which the 'loss of one latent print or firearm examiner is far more detrimental to the production of the BPD Crime Laboratory than the loss of one Criminalist.'"  Pl. Reply at 8 (quoting City Opp. at 14).  According to plaintiffs, Criminalists are divided into eight distinct positions in the Crime Lab, so merely comparing the number of Criminalists to the number of Latent Print and Firearms Examiners does not provide useful information.  Pl. Reply at 8.  It would not be irrational for the City to believe that the comparatively high number of Criminalists in the Lab made them more expendable than Latent Print and Firearms Examiners.  And, as long as the City rationally could have believed that such a comparison was useful and that it justified a greater pay raise for Latent Print and Firearms Examiners, rational-basis review is satisfied.

Plaintiffs also complain that defendants failed "to present to the court any statistical evidence showing that it is only the Latent Print and Firearms Examiners who play a vital role [in solving gun crimes]."  Pl. Reply at 3.  However, plaintiffs' suggestion that defendants are required to submit "statistical evidence" is flatly incorrect.  The only case plaintiffs cite in

- 27 -

support of their claim that statistical evidence is necessary is *Longanacre v. Crabtree*, 350 S.E.2d 760, 763 (1986), a case in which a West Virginia state court addressed an alleged violation of the West Virginia constitution.   The case is not apposite to plaintiffs' claim under the Equal Protection Clause.   Pursuant to governing federal law, defendants are under "no obligation to produce evidence to support the rationality of the [pay disparity], which may be based on rational speculation unsupported by any evidence or empirical data." *Giarratano*, 521 F.3d at 303.

## Conclusion

At bottom, plaintiffs argue that Criminalists are as important to the Lab as are Firearms Examiners or Latent Print Examiners, and therefore they deserve to be paid equally.   The Court is not unsympathetic to plaintiffs' position.   Indeed, they may well be correct.   However, the Equal Protection Clause does not mandate the elimination of all inequities.   Rather, it stands as a bulwark against classifications made on a proscribed basis or without any rational basis.   *See Armour*, 132 S. Ct. at 2080; *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981) ("As long as the classificatory scheme chosen by Congress rationally advances a reasonable and identifiable governmental objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred."); *Wilkins*, 734 F.3d at 347 ("[I]t is a practical necessity that most legislation classif[y] for one purpose or another, with resulting disadvantage to various groups or persons" (internal quotation marks omitted)).   Here, defendants have readily justified the pay disparity.   The City's decision need not be wise or correct.   Rather, in the context of this case, the City must have a rational basis to justify the pay disparity.

As discussed, several rational bases justify the higher salaries that the City pays to Latent Print and Firearms Examiners.   Therefore, I will grant summary judgment to defendants with respect to plaintiffs' federal and state constitutional claims.

A separate Order follows, consistent with this Memorandum Opinion.


Date: March 5, 2014                                              _____/s/_____
                                                                 Ellen Lipton Hollander
                                                                 United States District Judge